IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      -v-

$181,040.00 UNITED STATES CURRENCY,

      Defendant.

17-CV-_____

_____

## VERIFIED COMPLAINT FOR FORFEITURE

The United States of America, by its attorneys, James P. Kennedy, Jr., United States Attorney for the Western District of New York, Grace Carducci, Assistant United States Attorney, of counsel, for its verified complaint herein alleges as follows:

### Cause of Action

1. This is an action in rem for the forfeiture of the sum of $181,040.00 United States Currency (hereinafter "defendant currency"), which was seized from Robert Bavisotto (hereinafter "Bavisotto"), on or about June 30, 2017, pursuant to the provisions of Title 21, United States Code, Section 881(a)(6).

2. This Court has subject matter jurisdiction of this action pursuant to the provisions of Title 28, United States Code, Sections 1345 and 1355(a), and in rem jurisdiction pursuant to Title 28, United States Code, Sections 1355(b) and 1355(d). Venue is properly premised in the Western District of New York pursuant to Title 28, United States Code, Section 1395.

1

## Investigation

3.      On or about April 7, 2016, a joint task force investigation was initiated by New York State Police ("NYSP"), Drug Enforcement Administration ("DEA"), Alcohol, Tobacco, Firearms and Explosives ("ATF"), Homeland Security Investigations ("HSI"), Elmira Police Department ("EPD"), Corning Police Department ("CPD"), and Pennsylvania State Police ("PSO") involving Bavisotto and other participants in a drug trafficking organization, believed to be manufacturing and distributing tens of thousands of tablets containing Furanyl fentanyl and U-47700 in the greater Elmira, New York area.[1]

## Jail Calls Relating to Thatcher's Drug Activity

4.      Jail phone calls from a Robert Ian Thatcher (hereinafter referred to as "Thatcher"), a known participant of the drug trafficking operation, provided information regarding Bavisotto's involvement in the drug trafficking operation.

5.      On May 16, 2017, at approximately 8:28 p.m., Thatcher, while incarcerated at Livingston County Jail, placed a telephone call to Individual 1, who was using the telephone number (XXX) XXX-3994.  Pursuant to policy, the Livingston County Jail recorded the telephone call.[2]

6.      During the call, Thatcher and Individual 1 had the following exchange regarding Individual 1's interaction with law enforcement during the search of Thatcher's

---

[1] Said drug organization is believed to be responsible for overdose deaths in the Elmira/Corning areas.
[2] Each telephone call made from Livingston County Jail (including each of the telephone calls summarized in this complaint) is preceded by an automated warning to the participants in the call that the call is subject to monitoring and recording.

2

residence:

| | | |
|---|---|---|
| Thatcher: | | *Did you say nothing?* |
| Individual 1: | | *I mean I talked to them about stuff but nothing that . . .* |
| Thatcher: | | *Are you serious?* |
| Individual 1: | | *I am sure.* |
| Thatcher: | | *Listen to me. Have you hit my mom yet?* |
| Individual 1: | | *Yeah. Of course.* |
| Thatcher: | | *What about the other person?* |
| Individual 1: | | *Um.* |
| Thatcher: | | *Or have my mom hit them. Did you make sure to do that?* |
| Individual 1: | | *Oh, yeah no. Uh, all, all good.* |
| Thatcher: | | *Are you sure? You talked to them?* |
| Individual 1: | | *Yeah. He was there today with us.* |
| Thatcher: | | *All right.* |

7. Based on training, experience and knowledge of this investigation, law enforcement believes that in this telephone call, Thatcher was asking Individual 1 if law enforcement authorities had searched Bavisotto's residence when he asked if Individual 1 had contacted "the other person." Individual 1 responded that it was "all good," meaning that law enforcement authorities had not done so, and that "he" was at Thatcher's residence that day. Based on law enforcement's observation of Bavisotto at Thatcher's residence that day, it is believed that Thatcher and Individual 1 were cryptically referring to Bavisotto in this conversation.

3

8. On May 31, 2017, at approximately 2:53 p.m., Thatcher placed a telephone call from the Livingston County Jail to Individual 1, who was using the telephone number (XXX) XXX-3994. During the telephone call, Individual 1 mentioned evidence that was missed by law enforcement during the search of 604 South Lehigh Avenue, Sayre, Pennsylvania (hereinafter, "the Sayre location") residence. Specifically, Individual 1 said, "*They friggin did not search there because there was so much shit there that they should have, like . . .*" Thatcher interjected, apparently to prevent Individual 1 from making a recorded statement that could incriminate them, and said, "*Shh. Chill out.*"

9. On June 1, 2017, at approximately 8:42 p.m., Thatcher placed a telephone call from the Livingston County Jail to Individual 1, who was using the telephone number (XXX) XXX-3994. During the telephone call, Individual 1 explained to Thatcher that fewer people than expected have assisted her with cleaning Thatcher's residence and the Sayre location. Individual 1 told Thatcher that Bavisotto's girlfriend Individual 2 (hereinafter referred to as "Individual 2") assisted her with cleaning each location. Individual 1 said "*he* [Bavisotto] *hasn't even been around. It has been* Individual 2." Individual 1 also said, "Individual 2 *was wiping the walls and scrubbing the floors.*" Law enforcement had conversations with Individual 2, who confirmed that, at the time of this telephone call, she was Bavisotto's girlfriend and that she did in fact clean Thatcher's residence and was present at the Sayre location when Individual 1 removed the drugs and pill press. As a result, law enforcement concludes that Individual 1 was referring to Individual 2 in this telephone call.

10. On June 22, 2017, at approximately 4:45 p.m., Thatcher placed a telephone call

4

from the Livingston County Jail to Individual 1, who was using the telephone number (XXX) XXX-3994.  During the telephone call, Individual 1 explained to Thatcher that a storage unit used to store their household items had been burglarized and that Individual 1 believes that Individual 2 took the items.   The following is an excerpt of the call:

| | |
|---|---|
| Individual 1: | *Then she was like, oh, I have got an investigator*[3] *DEA coming to my house to frickin. The one that showed up at Bobbie's* [Bavisotto's] *house to um, tell him shit that you found. And I was like, oh, go the fuck ahead* Individual 2 *you're a psychotic fucking like story teller.* |
| Thatcher: | *Did you talk to my grandpa and tell him all this yet?* |
| Individual 1: | *Oh yeah.* |
| Thatcher: | *What did he say?* |
| Individual 1: | *Fucking nothing. "Oh I didn't know she was like this." You know what else she did? Fucking stupid cunt. She fucking . . .* |
| Thatcher: | *Tell him he better pay that money or it's a problem. Tell him he better pay it now. This is all his fault. Why did she have a fucking key yo? Tell him he better pay for everything. Tell him I said that. He better pay for everything or else.* |
| Individual 1: | *Um, you know what else she did?* |
| Thatcher: | *What?* |
| Individual 1: | *She fucking took one of every pair of shoes.* |
| Thatcher: | *Yeah. I don't want to talk about it on the phone no more. Come see me Saturday.* |
| Individual 1: | *I am saying she took one of every single pair.* |
| Thatcher: | *I know what you said. I don't want to say anything more on the phone but you know what I want done.* |

---

3 Law enforcement had not yet made contact with Individual 2 at the time this call between Thatcher and Individual 1 was recorded.

11. Based on training, experience and knowledge of this investigation, law enforcement believes that during this call, Individual 1 explained to Thatcher that their storage unit had been burglarized and that she believes that Individual 2 was the culprit. Individual 1 claimed that Individual 2 told her that she was in contact with a DEA Investigator "*the one that showed up at Bobbie's house*." Individual 1 claimed that Individual 2 intended to "*tell him shit that* [Individual 1] *found.*" As detailed herein, Individual 2 subsequently told law enforcement that, while she was present with Individual 1 at the Sayre location, Individual 1 found a quantity of blue pills and powder in the heating duct in the basement and a pill press/tableting machine concealed in the dryer in the basement. Based on the information provided by Individual 2, Law enforcement concludes that this conversation was about Individual 2 threatening to tell law enforcement about the contraband and evidence that Individual 1 retrieved from the Sayre location.

### Jail Calls Relating to the Defendant Currency

12. On June 28, 2017, at approximately 5:59 p.m., Thatcher made a telephone call from the Livingston County Jail to Individual 1 at (XXX) XXX-3994. During the call, Individual 1 stated that she "*just got to Grandpa's* [which is a reference to Bavisotto] *house . . . to get some money*." Individual 1 also stated that she does not want to "*get a job at McDonald's,*" but Thatcher's "*Grandpa* [Bavisotto] *said he can give 500 now because he said that* [Thatcher] *need[s] the rest for* [Thatcher's] *commissary and phone calls.*" Thatcher responded that Bavisotto "*was going to keep putting it* [meaning money] *in slowly over time or whatever.*" Individual 1 than stated, "[he] *said if it turns out that it's a thousand bucks a month that I need then it's gonna be gone.*" Thatcher responded that he did not want Individual 1 to take the "*last money*" he has to pay

the credit card bills. Individual 1 replied that she was not seeking to use the money to pay credit card bills, but needed it to pay for a dental appointment and her daughter's birthday.

13. On June 28, 2017, at approximately 6:20 p.m., Thatcher made a telephone call from the Livingston County Jail to Individual 1 at (XXX) XXX-3994. During the call, Bavisotto got on the line. Thatcher addressed Bavisotto as "*Grandpa*." Bavisotto told Thatcher that he was "*helping her out on a couple of things she came over here for*," which, based on law enforcement's training and experience, and the context of this investigation, meant that he was giving money to Individual 1. Thatcher responded that Individual 1 needed some money for their daughter's birthday. Bavisotto told Thatcher that he did not want "*anything to run short . . . in a hurry because . . . nothing's a bottomless pit*," which meant that Bavisotto was trying to make sure that Individual 1 did not spend the balance of Thatcher's money. Thatcher responded that Individual 1 should be a getting a job soon.

14. Based on the training and experience of law enforcement, and their knowledge of the investigation, it is believed that the above referenced jail telephone calls confirm that Bavisotto is currently storing money – consisting of Thatcher's drug proceeds[4] – at Bavisotto's residence and that Bavisotto is rationing the money to Individual 1 as needed. Bavisotto is the grandfather of Thatcher. Bavisotto has a prior conviction for drug trafficking and is currently involved in drug trafficking. In law enforcement's experience, criminals often rely on trusted family members and/or criminal associates to store and conceal drug proceeds, contraband and evidence for them.

---

4 Neither Thatcher nor Individual 1 have any lawful, gainful employment.

**Additional Probable Cause**

15. On June 23, 26, and 29, 2017, law enforcement spoke with Individual 2.[5] Individual 2 stated that she had been romantically involved with Bavisotto until about two weeks ago (early June 2017) and that their relationship ended when Bavisotto assaulted her and injured her arm/hand. Individual 2 stated that Bavisotto lives in the one bedroom apartment on the first floor of the Bavisotto's residence (not the studio apartment), and has access to and control over the basement and attic. Individual 2 also stated that Individual 1 had accused her of stealing several items from her and that the accusations were false. During the conversations with Individual 2, she made the following statements relevant to the defendant currency:

   a. Individual 2 said that, a couple of days after Thatcher's arrest on May 16, 2017, she was present at Bavisotto's residence when Individual 1 confronted Bavisotto to demand that he provide her with a portion of Thatcher's money. Individual 1 told Bavisotto that she knew he had Thatcher's money and she could not understand why she could not have the money to buy a car because it was her money too. Individual 2 said that Bavisotto "*said that he had to talk to him* [Thatcher] *first because he didn't know if he was supposed to give it to her.*" Individual 2 was in the basement at the time of this conversation, and the conversation between Individual 1 and Bavisotto took place on the first floor, but Individual 2 could hear the conversation. Individual 2 said that Bavisotto keeps Thatcher's drug proceeds in the attic of the Bavisotto's residence because Individual 1 has been known to act irresponsibly with unrestricted access to Thatcher's drug proceeds. This information is consistent with the information provided by a confidential source ("CS 1") that Individual 1 gave him $2,000 for no reason.

   b. On a subsequent date, Individual 2 observed Bavisotto give $4,500 in cash to D.C. – an associate of Thatcher's who lives at 3300 State Route 226, Tyrone, New York, which has a sign in front of the property reading "D.C. Cars" – at Bavisotto's residence in order to buy a car for Individual 1. At that time,

---

[5] One of the reasons for initially speaking with Individual 2 was to inform her about a threat of physical harm made by Thatcher during a recorded jail telephone call. Specifically, Thatcher had told Individual 1 that Individual 2 should have her jaw broken for allegedly stealing items from a storage unit.

  Individual 2 observed Bavisotto go to the attic at Bavisotto's residence, return with $4,500 in cash, and give it D.C. Individual 2 observed Bavisotto go to the attic at Bavisotto's residence and return with cash on at least two other subsequent occasions.

 c. Individual 2 also stated that Bavisotto was involved in distributing and storing quantities of marijuana at Bavisotto's residence from approximately December 2016 until she broke off her relationship with Bavisotto in early June 2017. Individual 2 estimated that, during that time, she observed Bavisotto go to the attic at Bavisotto's residence and return with a package/box which smelled strongly of marijuana approximately 30 and 40 occasions. According to Individual 2, Bavisotto had at least three marijuana customers (including D.C. and a woman in Horseheads with the first name "Lauren").

 d. Individual 2 also stated that Bavisotto was distributing and storing methamphetamine at Bavisotto's residence between approximately 2015 and the time she broke off her relationship with him in early June 2017. She identified approximately seven customers to whom Bavisotto would distribute meth. Bavisotto would generally distribute the methamphetamine at Bavisotto's residence, but started delivering to his customers after law enforcement came to Bavisotto's residence (which occurred on May 24, 2017 when Bavisotto provided law enforcement with a limited consent search). When a customer would come to the house, Bavisotto would send Individual 2 and the customer to the basement. Individual 2 would hear something sliding across the floor in the kitchen and Bavisotto would then come to the basement and distribute the methamphetamine to the customer in front of Individual 2.

 e. Individual 2 explained that Bavisotto's nephew and his wife live on the second floor of Bavisotto's residence, directly below the attic area of the residence, but "*they don't know what is up there.*"

 f. Individual 2 also confirmed that she had, in fact, told Individual 1 that she (Individual 2) was considering contacting law enforcement because she felt that she "*had no other options.*" This statement by Individual 2 is consistent with the statement by Individual 1 during the above-described telephone call with Thatcher on June 22, 2017, that Individual 2 had threatened to contact law enforcement.

16. On December 7, 2017, a bank teller, at Bavisotto's banking institution; Corning Credit Union was interviewed by law enforcement. The teller remembered waiting on Bavisotto in late December 2016, at which time he came up to the teller counter, appeared

9

rushed and made a $4,000 cash deposit, all in $20 bills, which had a strong and distinct marijuana odor. The odor coming from the money was so strong, that it had to be sent for mutilation. The teller also noted that Bavisotto had come in to the bank on other occasions and was helped by other tellers, who later complained of the strong and distinct marijuana odor coming from the bills.

### Search Warrant executed at Bavisotto's Residence

17. On June 30, 2017, law enforcement agents and investigators conducted a Federal Search Warrant at Bavisotto's residence located at 173 Decatur Street, Corning, New York (hereinafter referred to as "Bavisotto's residence").

18. There was probable cause to believe that Bavisotto's residence contained evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession of controlled substances and controlled substance analogues with intent to distribute, and distribution of controlled substances and controlled substances analogues), 846 (attempt and conspiracy to possess with intent to distribute, and to distribute, controlled substances and controlled substance analogues), 952 and 960(a)(1) (importation of controlled substances and controlled substance analogues), and 963 (attempt and conspiracy to import controlled substances and controlled substances analogues).

19. The probable cause was based on arrests of participants of the drug trafficking operation involving Bavisotto, evidence seized during search warrant executions, confidential sources, reports and information received from law enforcement agents and agencies, and review of recorded telephone calls from the Livingston County Jail where the targets of the

investigation were in custody.

20. Upon entry to Bavisotto's residence, agents/investigators found Bavisotto and Individual 1 sitting at the kitchen table, secured the premises and began their search wherein they located one (1) gram of crystal meth, a small amount of marijuana, a grinder with marijuana residue and a scale. The drugs were subsequently submitted for testing and yielded positive results.

21. During the search at Bavisotto's residence, agents/investigators obtained information indicating that participants of the drug trafficking organization had used a property in the woods (subsequently found to be 3300 State Route 226, Tyrone, New York) to store a pill presses for the drug trafficking organization.

22. Agents/investigators received information around the time of the search from a confidential source ("CS 2") who indicated that Bavisotto had placed a safe in the bedroom closet on the second floor of Bavisotto's residence, approximately three weeks prior to the search and was unsure of its contents. Agents located the key to the safe in the kitchen of the Bavisotto's residence and found $181,040.00 United States Currency, vacuum-sealed in plastic and bundled and secured with rubber bands.

23. The breakdown of the defendant currency seized is as follows:

| **Denomination** | **Number of Bills** | **Value of Bills** |
|---|---|---|
| $100 | 1072 | $107,200 |
| $50 | 258 | $12,900 |
| $20 | 3046 | $60,920 |
| $10 | 2 | $20 |

24.	On June 30, 2017, the defendant currency was sealed and secured at Bavisotto's residence and then transported to the DEA Rochester Resident Office where it was secured within the seized currency evidence vault.  On July 5, 2017, agents transported the $181,040.00 United States Currency for an official count and electronic transfer to the United States Marshal's Office, with assigned ID Number 17-DEA-632434, pending forfeiture proceedings, and is held within the jurisdiction of this Court.

25.	Based on all the foregoing facts and circumstances, and the experience and training of the law enforcement officers involved, the defendant currency, specifically $181,040.00 United States Currency, was furnished or intended to be furnished in exchange for controlled substances, all proceeds traceable to such an exchange and/or was used or intended to be used to facilitate the purchase and/or selling of a controlled substance and, therefore, is subject to seizure and forfeiture to the United States of America pursuant to Title 21, United States Code, Section 881(a)(6).

### Bavisotto's Criminal History

26.	As a result of the drugs found in Bavisotto's possession at his residence at the time the search warrant was executed, Bavisotto was charged with Criminal Possession of a Controlled Substance in the 7th Degree.  Bavisotto pled guilty in the Steuben County Court and received a conditional discharge.

27.	Bavisotto's prior criminal history includes being sentenced on October 12, 1982

in Steuben County Court to the following charges:

- Criminal Sale Controlled Substance in the 1st Degree (NYS Penal Law 220.43), a Class A Felony and sentenced to a term of 20 years to life.

- Criminal Sale Controlled Substance in the 2nd Degree (NYS Penal Law 220.41), a Class A Felony and sentenced to 9 years to life.

28. In addition, on August 26, 2013, Bavisotto was sentenced in Steuben County Court to 4 months after pleading guilty to Hindering Prosecution in the Second Degree (NYS Penal Law 205.60), a Class E Felony.

### Claim Filed in the Administrative Forfeiture Proceedings

29. On or about September 21, 2017, Bavisotto submitted a claim through his attorney at that time, David Morabito, Esq., to the Drug Enforcement Administration to halt the administrative forfeiture proceedings against the defendant currency for judicial forfeiture proceedings. To date, there have been no other claims submitted.

### Conclusion

WHEREFORE, the United States of America respectfully requests that:

(1) due process issue for arrest of the defendant currency;

(2) all persons having any interest therein be cited to appear and show cause why the forfeiture should not be decreed;

(3) a judgment be entered declaring the defendant currency condemned and forfeited to the United States of America for disposition in accordance with the law;

(4) the costs of this suit be paid to and recovered by the United States of America; and the Court grants such other and further relief as deemed just and proper.

DATED:    December 19, 2017, at Rochester, New York.

    JAMES P. KENNEDY, JR.
    United States Attorney
    Western District of New York

    s/ GRACE M. CARDUCCI
By:    GRACE M. CARDUCCI
    Assistant U.S. Attorney
    United States Attorney's Office
    Western District of New York
    100 State Street, Suite 500
    Rochester, New York 14614
    (585) 399-3954
    grace.carducci@usdoj.gov

STATE OF NEW YORK   )
COUNTY OF MONROE   )   ss.:
CITY OF ROCHESTER   )

KEVIN BLACK, being duly sworn, deposes and says:

I am a Special Agent with the Drug Enforcement Administration, Rochester Resident Office, and I am familiar with the facts and circumstances surrounding the seizure of $181,040.00 United States Currency from Robert Bavisotto at his residence located at 173 Decatur Street, Corning, New York on or about June 30, 2017.  The facts alleged in the Complaint for Forfeiture are true to the best of my knowledge and belief based upon information furnished to me by officials of the New York State Police ("NYSP"), Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), Elmira Police Department ("EPD") and Corning Police Department ("CPD"), and the officials of the United States Department of Justice.

s/ KEVIN BLACK
KEVIN BLACK
Special Agent,
Drug Enforcement Administration

Subscribed and sworn to
before me this 19th day
of December, 2017.

s/ Marcy J. Conaway
Notary Public

MARCY J. CONAWAY
REGISTRATION NO.: 01CO6059084
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN MONROE COUNTY
COMMISSION EXPIRES MAY 21, 2019